UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| PAUL M. BUSH, | ) |
| Plaintiff | ) ) ) |
| vs. | ) CAUSE NO. 2:11-CV-377 ) |
| CAROLYN W. COLVIN,[1] COMMISSIONER OF SOCIAL SECURITY, | ) ) ) ) |
| Defendant | ) |

OPINION AND ORDER

Paul Bush seeks judicial review of the final decision of the Commissioner of Social Security denying his applications for disability insurance benefits and Supplemental Security Income under the Social Security Act, 42 U.S.C. §§ 423 and 1381 *et seq.* The court has jurisdiction over this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons that follow, the court reverses and remands this case to the Social Security Administration for further proceedings.

Mr. Bush asserted disability as of June 11, 2007 due to headaches, neck pain, carpal tunnel syndrome, obesity, and depression. His applications were denied initially, on reconsideration, and after an administrative hearing at which he was represented by counsel.

In evaluating Ms. Bush's claim of disability, the ALJ considered the documentary evidence presented at the hearing and testimony from Mr. Bush and

---

[1] Carolyn W. Colvin, the Acting Commissioner of Social Security, has been substituted as the named defendant, pursuant to Fed. R. Civ. P. 25(d)(1).

a vocational expert, Thomas Grzesik. The ALJ found that Mr. Bush had severe physical impairments (a history of stroke, obesity, headaches, and chronic neck pain) and a non-severe mental impairment (depression), but that his impairments alone and in combination didn't meet or equal the requirements of a listed impairment, or preclude him from performing his past relevant work as a security guard, mail clerk, computer operator, or tire service manager, and other jobs that existed in significant numbers in the national economy. The ALJ therefore concluded that Mr. Bush was not disabled within the meaning of the Act, and was not entitled to benefits.

When the Appeals Council denied Mr. Bush's request for review, the ALJ's decision became the final decision of the Commissioner of Social Security. Jones v. Astrue, 623 F.3d 1155, 1160 (7th Cir. 2010). This appeal followed.

Mr. Paul challenges the ALJ's findings about the severity and limiting effects of his headaches and depression, contending that the ALJ ignored or selectively omitted evidence favorable to his claim of disability (*i.e.*, his subjective complaints of pain after April 2009, reported GAF scores, and corroborating statements by his long-time girl friend Diana Bush); failed to accord appropriate weight to the opinion of his treating physician and psychologist, Dr. Vyas and Dr. Rini; and didn't explain why his statements concerning the intensity, persistence and limiting effects of his symptoms weren't credible.

I. STANDARD OF REVIEW

The issue before the court isn't whether Mr. Bush is disabled, but whether substantial evidence supports the ALJ's decision that he is not. Scott v. Astrue, 647 F.3d 734, 739 (7th Cir. 2011); Nelms v. Astrue, 553 F.3d 1093, 1097 (7th Cir. 2009). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Jones v. Astrue, 623 F.3d 1155, 1160 (7th Cir. 2010). In reviewing the ALJ's decision, the court can't reweigh the evidence, make independent findings of fact, decide credibility, or substitute its own judgment for that of the Commissioner, Simila v. Astrue, 573 F.3d 503, 513 (7th Cir. 2009); Powers v. Apfel, 207 F.3d 431, 434-435 (7th Cir. 2000), but it "will conduct a critical review of the evidence, considering both the evidence that supports, as well as the evidence that detracts from, the Commissioner's decision." Briscoe v. Barnhart, 425 F.3d 345, 351 (7th Cir. 2005). The ALJ isn't required "to address every piece of evidence or testimony presented, but he must provide a 'logical bridge' between the evidence and the conclusions so that [the court] can assess the validity of the agency's ultimate findings and afford the claimant meaningful judicial review." Jones v. Astrue, 623 F.3d at 1160.

II. A<small>NALYSIS</small>

A. *Mr. Bush's Mental Impairment*

In assessing the severity of Mr. Bush's mental impairment, the ALJ indicated that he considered the criteria in 20 C.F.R. Pt. 404, Subpt. P, App. 1, Sec. 12.00(C) (activities of daily living, social functioning, concentration, persistence, or pace, and episodes of decompensation), and found that:

> Because the claimant's medically determinable mental impairment causes no more than "mild" limitation in any of the first three functional areas and "no" episodes of decompensation which have been of extended duration in the fourth area, it is nonsevere (20 CFR 404.1520a(d)(1) and 416.920a(d)(1)).

In support, the ALJ cited a mental status evaluation completed by a consulting clinical psychologist, Dr. Irena Walters, on March 5, 2008; a March 11, 2008 Psychiatric Review Technique form completed by a state agency psychologist, Joelle Larsen, Ph.D., and reviewed and affirmed by Dr. William Shipley on April 25, 2008; and the psychiatric intake evaluation and outpatient progress notes from St. Catherine Hospital's Daybreak Behavioral Health Clinic for the period August 1, 2008 to March 31, 2009. While the ALJ acknowledged that Mr. Bush's treating psychologist, Dr. Rini, had opined in a February 2010 assessment that Mr. Bush's mental impairment caused some moderate limitations in his ability to function, he found that Dr. Rini's opinion wasn't entitled to "any significant weight" because it wasn't supported by the objective record or Mr. Bush's "extremely limited" history of mental health treatment.

A treating physician's opinion is only entitled to "controlling weight" if it's

4

"well supported by medical findings and not inconsistent with other substantial evidence in the record." Clifford v. Apfel, 227 F.3d at 870; see also 20 C.F.R. § 404.1527(d)(2). When a treating source's opinion isn't given controlling weight, the ALJ must consider all of the following factors in deciding what weight to give it and any other medical opinion: is there an examining relationship, is there a treatment relationship, if so, what is the length, nature, and extent of the treatment relationship, and how frequent were the examinations; is the opinion supported by relevant evidence (*i.e.*, medical signs and laboratory findings), is the opinion consistent with the record as a whole, and is the source of the opinion a specialist. *See* 20 C.F.R. § 404.1527(c); Butera v. Apfel, 173 F.3d 1049, 1056-1057 (7th Cir. 1999).

In her March 5, 2008 mental status evaluation, Dr. Walters, a consulting and examining psychologist, indicated that Mr. Bush was depressed and might suffer from bipolar disorder, had a history of other physical medical problems, including reports of stroke, headaches, neck pain and vertigo, and had a GAF of 55 – indicating moderate symptoms or difficulty in social, occupational, or school functioning. The August 1, 2008 psychiatric intake evaluation from St. Catherine Daybreak Behavioral Health Clinic, completed almost five months later, also showed a GAF of 55. The ALJ nevertheless concluded that Dr. Walter's opinion and the medical records from the Behavioral Health Clinic supported a finding of only mild limitations in functional capacity.

The law doesn't require an ALJ to determine the extent of a disability based

5

on an unexplained GAF score,[2] Denton v. Astrue, 596 F.3d 419, 425 (7th Cir. 2010); Howard v. Commissioner of Social Security, 276 F.3d 235, 241 (6th Cir.2002) (GAF score may assist ALJ in formulating claimant's residual functional capacity, but is not essential), or to address every piece of evidence in the record, O'Connor-Spinner v. Astrue, 627 F.3d at 618; Getch v. Astrue, 539 F.3d at 480, but an explanation of the inconsistent findings was warranted in this case.

The ALJ's analysis of the conflicting medical opinions is similarly flawed. Dr. Rini, a licenced clinical psychologist and treating source, completed a mental RFC assessment and a medical assessment of condition and ability to do work-related activities in February 2010, in which she opines that Mr. Bush has a mental impairment, bipolar disorder II, and moderate limitations in his ability to maintain attention and concentration for extended periods, to complete a normal workday and workweek without interruptions from psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, and to accept instructions and respond appropriately to criticism from supervisors. Dr. Rini also opined that his condition had improved and was "in partial remission," that the "prognosis for optimal management is good." According to Dr. Rini, "[Mr. Bush] is aware of his limitations (*i.e.*, low frustration tolerance, etc) and takes care to

---

[2] A GAF score measures a "clinician's judgment of the individual's overall level of functioning," and is intended to be used to make treatment decisions. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 32 (4th Ed. Text Rev.2000). "[T]he score does not reflect the clinician's opinion of functional capacity." Denton v. Astrue, 596 F.3d 419, 425 (7th Cir. 2010).

avoid toxic situations."

The ALJ gave no explanation as to why the opinion of the state agency psychologists, which were conclusory, unsupported by objective evidence, and incomplete, were entitled to more weight than Dr. Rini's opinion, or why the GAF scores reported by Dr. Walters and the Behavioral Health Clinic weren't consistent with Dr. Rini's opinion. Such an analysis is legally and factually insufficient.

B. *Mr. Bush's Physical Impairment*

The medical evidence showed that Mr. Bush suffered a cerebral infraction (a stroke) in January 2007, resulting in an acute onset of headaches and right-sided weakness. He was treated with medication and released, but continued to experience headaches and dizziness. Various reports suggest that Mr. Bush suffers from tension, migraine, and/or sinus headaches, that his response to prescribed treatments has been mixed, and that he also suffers from mild cervical spondylosis, obstructive sleep apnea, severe obesity, and allergic sinusitis.

Mr. Bush was hospitalized briefly again in December 2007 with complaints of right sided weakness. A CT scan of the brain revealed the old infractions in the cerebellar area with possible vertibral artery circulation compromise, but an echocardiogram performed on December 21, 2007, showed normal left ventricular size and systolic function, with no evidence of cardiac source of embolus. EEGs on January 3 and 17, 2008 were normal.

When Dr. B. Saavedra, a consulting physician for the Disability Determination Bureau, examined Mr. Bush on February 21, 2008, he noted that

no medical records were available for review. His impressions following the examination were that Mr. Bush suffered from obesity, hypercholesterolemia, high blood pressure, and had self-reported history of stroke affecting his right side, and of cervical pain with normal range of motion.

Dr. Mangala Hasanadka, a state agency physician, completed a Physical Residual Functional Capacity Assessment in March 17, 2008, in which he indicated that Mr. Bush's primary diagnoses was obesity, and found that Mr. Bush could occasionally lift twenty pounds and frequently lift ten pounds; could stand and sit about six hours in an eight-hour workday; had an unlimited ability to push and/or pull; could occasionally climb ramps and stairs, stoop, kneel, crouch and crawl, but couldn't climb ladders, ropes, or scaffolds; and that he had no manipulative, visual, communicative, or environmental limitations. Dr. Hasanadka opined that while the medical evidence of record supported Mr. Bush's allegations and contentions regarding the nature of his symptoms, his contentions regarding the severity of, and the related functional restrictions, weren't, and that Mr. Bush therefore was only "partially credible." Dr. Fernando Montoya reviewed and affirmed Dr. Hasanadka's assessment on April 25, 2008.

An MRI of Mr. Bush's cervical spine in June 2008 showed central disk extrusion and proximal migration at C5-6 with flattening of the ventral thecal sac and impingement on the spinal cord, and small central protrusions at C2-3, C3-4 and C4-5 causing impression on the ventral thecal sac without significant compression of the spinal cord.

Dr. R. Kanakamedala, a consulting physician at the Margaret Mercy Pain Management Center, opined in a June 11, 2008 report that Mr. Bush suffered from cervical degenerative disc disease causing axial neck pain and headaches and cervical facet pain. He recommended an epidural steroid injection, which was administered on June 25, 2008. Dr. Kanakamedala's notes from a follow-up visit on July 23, 2008, however, indicate that: "epidural not helpful-had blurry vision for 8 hrs. Suspend Plavix for 7 days. Unable to do daily activities due to pain. Examined by Dr. Kanakamedala-will do diagnostic medial branch block [to evaluate source of neck and head pain]." The block was performed on October 29, 2008, and Mr. Bush was to return for a follow-up visit in two weeks, but there is no record of any visits after the October 29, 2008 procedure.

When Dr. Michael Spence examined Mr. Bush in April 2009, his medical history listed the January 2007 stroke, morbid obesity, obstructive sleep apnea managed on CPAP, bipolar disorder, and depression, and he complained of of constant headaches, neck pain, intermittent dizziness, vertigo, and tremors, transient numbness in both hands and his anterior thighs, and intermittent tinnitus. Dr. Spence noted that Mr. Bush had received a cervical epidural steroid injection in June 2008 and cervical medial branch block in October 2008, without significant pain relief, but reported "90% relief of his headaches with [N]orco." Dr. Spence opined that:

(1) Mr. Bush had degenerative disc disease and cervical spondylosis as demonstrated on the July 2007 MRI, which "commonly present with pain in the

9

neck and shoulders and can radiate to include a tension type headache"; and that his headaches' could be the result of the stroke in 2007;

(2) The physical exam didn't support Mr. Bush's self reported limitations regarding the ability to sit and stand (able to tolerate sitting for 60 to 90 minute episodes and standing for 45 minute episodes), but limitations regarding lifting (claimed neck pain and headaches aggravated after lifting greater than ten pounds) was "clinically supported because the cervical paraspinals will be recruited with heavy lifting resulting in cervical strain and irritation of the arthritic cervical facet joints";

(3) Mr. Bush "wished to return to work," "demonstrated adequate effort and participation during the physical exam, and did not exhibit pain behaviors," and that there was no indication of a "non-organic etiology of his neck pain"; and

(4) that Mr. Bush "demonstrated a non-antalgic gait and was able to perform transfers without difficulty.

Treatment notes from March 13, 2009 to February 26, 2010 and an April 13, 2010 Medical Assessment of (Physical) Condition and Ability To Do Work-Related Activities by Dr. Daksha Vyas, a treating neurologist specializing in pain management, indicated that Mr. Bush had carpal tunnel syndrome in his left hand and cervical degenerative disc disease; that Dr. Vyas saw Mr. Bush for pain management on six occasions between March 2009 and February 2010, administered trigger point injections on September 30, 2009 and February 26, 2010 (when Mr. Bush asked for "something stronger for pain other then Norco

10/325") and prescribed pain medications; that he could stand/walk for fifteen minutes uninterrupted on a good day, zero minutes on a bad day; can sit for 1 hour on a good day, and "stays in bed" on bad days; can lift and carry twenty pounds occasionally and ten pounds frequently; has problems bending, pushing, pulling, manipulating objects, reaching, and hearing and seeing. Dr. Vyas opined that Mr. Bush was:

(1) "extremely impaired" in his ability to maintain attention and concentration, perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, work in coordination with or proximity to others without being distracted by them, accept instructions and respond appropriately to criticism from supervisors, complete a normal workday and workweek without interruptions and perform at a consistent pace;

(2) "markedly impaired" in his ability to understand, remember and carry detailed instructions; and

(3) "moderately impaired" in his ability to understand, remember and carry out very short and simple instructions, accept supervision, and get along with coworkers.

The ALJ found that while Mr. Bush's headaches and other physical impairments (history of stroke, obesity, and chronic neck pain) were severe, he retained the functional capacity to perform a light work, with exertional limitations, and could perform both his past relevant work and other work that existed in significant numbers in the national economy. His residual functional

capacity findings were based on the medical evidence (which, according to the ALJ, "has repeatedly been essentially normal"), the report of a consulting examination by Dr. B. Saavedra in February 2008, and the ALJ's assessment of Mr. Bush's credibility. The ALJ rejected Dr. Vyas's opinion, finding that it wasn't supported by objective evidence and was "totally inconsistent with the level of activities that the claimant himself has admitted to performing."

As already discussed, the ALJ's assessment of the medical source opinions in Mr. Bush's case doesn't adequately address the relevant factors that must be considered, and is insufficient. The ALJ said that Dr. Vyas's opinion wasn't entitled to any weight because he'd only been treating Mr. Bush since March 2009, but doesn't mention that Dr. Saavedra only examined Mr. Bush once and noted that no medical records were available at the time for him to review.

To the extent the ALJ's assessment of Dr. Vyas's opinion and Mr. Bush's residual functional capacity is premised on his assessment of Mr. Bush's credibility, it too is insufficient. The ALJ employed unhelpful boilerplate language in explaining his credibility determination:

> . . . the claimant's medically determinable impairments could reasonably be expected to cause the alleged reported symptoms; however, the claimant's representations concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment....[which limits him to] light work activity, with additional limits to only occasionally stooping, kneeling, crouching, crawling, and climbing stairs, [and] fully accommodate[s] the claimant's neck and alleged back pain, when considered in combination with his obesity.

The court of appeals has justly criticized this language because of its unhelpfulness. Bjornson v. Astrue, 671 F.3d 640, 645 (7th Cir. 2012); Parker v Astrue, 597 F.3d 920, 922 (7th Cir. 2010). "If the sentence means what it says, one must read the opinion from back to front, first identifying the ALJ's residual functional capacity, then looking to the claimant's testimony, sorting out what supports the finding (and hence was credible) from what doesn't support the finding (and hence wasn't believed)." Brindisi v. Barnhart, 315 F.3d 783, 787-788 (7th Cir. 2003).

The use of the boilerplate language doesn't require reversal if the ALJ points to information that justifies his credibility determination, *see* Shideler v. Astrue, 688 F.3d 306, 311-312 (7th Cir. 2012); Getch v. Astrue, 539 F.3d 473, 483 (7th Cir. 2008), but the court shouldn't have to comb the record in search of evidence supporting his decision.

Whether Mr. Bush's statements are credible and whether he is capable of performing his past relevant work and other jobs are questions for the ALJ, not the court. Simila v. Astrue, 573 F.3d at 513; Powers v. Apfel, 207 F.3d at 434-435. The court's job is to assure that a logical bridge connects the evidence and the ALJ's finding, *see* Giles ex rel. Giles v. Astrue, 483 F.3d 483, 486 (7th Cir. 2007), and the bridge isn't complete in this case.

III. CONCLUSION

The record in this case was voluminous; the evidence was inconsistent,

13

unsupported, and contradictory; and the ALJ was faced with an onerous task. But his findings with respect to the severity and limiting effects of Mr. Bush's mental and physical impairment aren't supported by substantial evidence or an adequate discussion of the issues presented. Where, as here, the court can't see an "accurate and logical bridge between the evidence and the result," remand is required. Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996).

Accordingly, the final decision of the Commissioner of Social Security is REVERSED and the matter REMANDED.

SO ORDERED.

ENTERED:   September 20, 2013

/s/ Robert L. Miller, Jr.
Judge
United States District Court